**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GREAT BASIN MINE WATCH, and
MINERAL POLICY CENTER,
       *Plaintiffs-Appellants,*

       v.

HELEN HANKINS, UNITED STATES
DEPARTMENT OF THE INTERIOR, and
BUREAU OF LAND MANAGEMENT,
       *Defendants-Appellees,*

NEWMONT USA LIMITED,
       *Defendant-Intervenor-*
          *Appellee.*

No. 04-16125

D.C. No.
CV-02-00605-
HDM/RAM

OPINION

Appeal from the United States District Court
for the District of Nevada
Howard D. McKibben, District Judge, Presiding

Argued and Submitted
February 14, 2006—San Francisco, California

Filed August 1, 2006

Before: J. Clifford Wallace, Michael Daly Hawkins, and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Wallace;
Partial Concurrence and Partial Dissent by Judge Thomas

## COUNSEL

Roger Flynn, Jeffrey C. Parsons, Western Mining Action Project, Boulder, Colorado; Nicole U. Rinke, Western Mining Action Project, Reno, Nevada, for the plaintiffs-appellants.

Thomas L. Sansonetti, Andrew Mergen, John E. Arbab, Dept. of Justice, Washington, D.C., for the defendants-appellees.

Scott W. Hardt, Temkin Wielga & Hardt LLP, Denver, Colorado, for the intervenor-appellee.

## OPINION

WALLACE, Circuit Judge:

Great Basin Mine Watch and the Mineral Policy Center (collectively, Great Basin) appeal from the district court's

summary judgment on their claims against the United States Department of the Interior and the Bureau of Land Management (collectively, Bureau). Great Basin alleged that the Bureau's approval of two gold mining permits to the Newmont Mining Corporation (Newmont) violated, *inter alia*, the National Environmental Policy Act (NEPA), 42 U.S.C. § 4312, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 704-706. Newmont appears as an intervenor in this appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm in part, reverse in part, and remand.

**I.**

In March 1997, Newmont submitted a plan proposing expansion of Newmont's existing open-pit gold mining and ore processing facilities to the Elko Field Office of the Bureau. The proposed expansion was to be located at Newmont's South Operations Area Project, which was approved in 1993, approximately six miles northwest of Carlin, Nevada. The expansion was to be known as the South Operations Area Project Amendment (Amended South Project) and was estimated to result in a total additional disturbance of 1,392 acres of land, 839 of which are public. Amended South Project was intended to deepen the existing Gold Quarry Mine, to continue dewatering the mine, and to continue discharging excess groundwater into Maggie Creek, a creek located near the mine.

Pursuant to NEPA, the Bureau concluded that Amended South Project could cause a significant environmental impact and ordered the preparation of an environmental impact statement (EIS). The Bureau released a draft EIS in September 2000, and issued a final EIS in April 2002. In April 2002, the Bureau also released the "Cumulative Impact Analysis of Dewatering and Water Management Operations for the Betze Project, South Operations Area Project Amendment, and Leeville Project," a technical report detailing the hydrological

effects of three proposed and existing mining projects in the region.

The Bureau issued a Record of Decision for Amended South Project in July 2002. The Decision chose an alternative to Newmont's plan, consisting of Newmont's Amended South Project proposal and an amended version of the 1993 South Project mitigation plan. The Decision found that the revised agency-preferred alternative would not "cause unnecessary or undue degradation of the public lands, and [would] not cause any unacceptable conflict with other significant resources in the area."

Pursuant to its regulations, the Bureau directed Newmont to post an incremental bond of $19,753,284 for the first phase of Amended South Project, which called for the expansion of a waste rock disposal facility, a $3,000,000 bond for possible stream flow augmentation, and a $465,000 bond for groundwater and surface water monitoring. Pursuant to the Bureau's regulations, Newmont would have to post further phased bonds before going ahead with other activities.

Meanwhile, in April 1997, one month after submitting the Amended South Project proposal, Newmont submitted a proposal for the Leeville Project (Leeville), a proposed underground gold mine located twenty miles northwest of Carlin. The plan, which like the Amended South Project was submitted to the Elko Field Office, called for construction of five shafts to depths of approximately 2,500 feet to access three main bodies of ore and for construction of ancillary mine facilities. The proposal was estimated to result in a disturbance of 486 acres of land, 453 of which are public. Refractory ore produced from Leeville was to be hauled by truck and processed at an existing mill located at the South Operations Area.

The Bureau determined that the Leeville proposal could potentially have a significant environmental impact and pre-

pared an EIS. The Bureau released a draft EIS in March 2002, and a final EIS in July 2002. The April 2000 Cumulative Impacts Analysis was "used as a foundation for the cumulative impacts analyses" with regard to Leeville.

The Bureau issued a Record of Decision for Leeville in September 2002. The Leeville Decision selected the agency-preferred alternative, which modified the Leeville proposal and implemented a mitigation plan. As with the Amended South Project Decision, the Leeville mitigation plan was an extension of the 1993 South Project mitigation plan and mainly addressed impacts related to dewatering. The Bureau found that implementation of the agency-preferred alternative and the Leeville mitigation plan would not "cause unnecessary or undue degradation of the public lands and [would] not cause any unacceptable conflict with other significant resources in the area." The Bureau ordered Newmont to provide a bond of $4,974,200 for post-mine closure reclamation, and a bond of $875,700 for groundwater and surface water monitoring.

Two months later, Great Basin filed an action in the district court against the Bureau of Land Management, the Department of the Interior, and Helen Hankins, the manager of the Bureau's Elko Field Office. The complaint sought judicial review of the final EISs, the Decisions, and the bonding determinations, asserting claims under federal statutes including NEPA and the APA. Newmont intervened as a defendant. The parties filed cross-motions for summary judgment. Before the district court acted on the motions, Great Basin sought to introduce an extra-record document from the Nevada Division of Environmental Protection. According to Great Basin, this document was relevant as to whether Amended South Project and Leeville were connected actions that should have been evaluated in a single EIS. The district court refused to admit the document or to take judicial notice of the facts contained in the document.

The district court entered summary judgment in favor of defendants on all claims.

## II.

We review the summary judgment de novo. *Hall v. Norton*, 266 F.3d 969, 975 (9th Cir. 2001). As this is a record review case, "we may direct that summary judgment be granted to either party based upon our de novo review of the administrative record." *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005) (as amended). The district court's determination as to whether an EIS satisfies the requirements of NEPA is a question of law reviewed de novo. *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1150 (9th Cir. 1997). Whether a plaintiff has exhausted required administrative remedies is a question of law reviewed de novo. *See Bankston v. White*, 345 F.3d 768, 770 (9th Cir. 2003).

Judicial review of agency decisions under NEPA, the Clean Water Act, and the Federal Land Policy Management Act (Management Act) is governed by the APA, which dictates that an agency action may be overturned only where it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377 (1989) (applying arbitrary and capricious standard to the adequacy of an EIS under NEPA); *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002) (applying arbitrary and capricious standard to NEPA claims); *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998) (applying arbitrary and capricious standard to Clean Water Act claims).

In determining whether a decision is arbitrary and capricious, we will "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Thomas*, 137 F.3d at 1149, *quoting Marsh*, 490 U.S. at 378. We must also ensure that the agency "took a hard look at the environmental consequences

of its action." *Northwest Resource Info. Ctr., Inc. v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1060, 1066 (9th Cir. 1995) (internal quotations and citations omitted). However, we may reverse under the arbitrary and capricious standard only if the agency has relied on factors Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered "an explanation [for its decision] that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Sierra Club v. EPA*, 346 F.3d 955, 961 (9th Cir. 2003) (noting standard), *amended by* 352 F.3d 1186 (9th Cir. 2003).

We review the district court's decision whether to admit extra-record evidence for an abuse of discretion. *Southwest Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1447 (9th Cir. 1996).

## III.

In 1972, Congress passed the Clean Water Act to create a comprehensive national system of regulation of water pollution, in which the federal government and the states share responsibilities. *See* 33 U.S.C. §§ 1251-1376. There are two general types of standards under the Act: effluent standards, which limit the quantity of pollutants discharged from a source; and ambient water quality standards, which limit concentrations of pollutants in a stream. The administration of these standards is left to the states, which are free to impose stricter regulations than those required by federal law.

Great Basin contends that the Bureau violated the Clean Water Act and the Management Act by failing to ensure compliance with water quality standards in two ways: first, because the potential "drying effect" indicates that the Bureau failed to maintain "all beneficial uses" of the water, and second, because the discharges of pumped groundwater will violate water quality standards. The district court granted

summary judgment on the first claim because "[t]he relationship between water flow and aquatic life is a question of fact that lies within the technical expertise of the agency." The district court declined to reach the second claim because it held that Great Basin had not presented it adequately to the Bureau in the first instance.

### A.  *Potential "Drying Effect"*

Great Basin argues that the Bureau's approval of Leeville and Amended South Project violates the Clean Water Act, the Management Act, and the Bureau's own mining regulations, *see* 43 C.F.R. § 3809, because the projects will extend the periods during which existing springs and streams are dry. This, Great Basin contends, would violate federal and state requirements under the Clean Water Act that beneficial uses of waterways be maintained, and would also implicate the Act's "antidegradation" requirements. While the district court dismissed the claim as a question of fact lying within the technical expertise of the agency, we do not reach the factual basis of the claim and hold that it fails as a matter of law.

[1] It is clear that the Clean Water Act does not supersede, abrogate, or otherwise impair "the authority of each state to allocate quantities of water within its jurisdiction." 33 U.S.C. § 1251(g). States are responsible for enforcing water quality standards on intrastate waters. *See* 33 U.S.C. § 1319(a). Section 401 of the statute "requires States to provide a water quality certification before a federal license or permit can be issued for activities that may result in any discharge into intrastate navigable waters." *PUD No. 1 of Jefferson Cty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 707 (1994), *citing* 33 U.S.C. § 1341.

Great Basin places heavy weight on *PUD No. 1*, arguing that the case requires the Bureau to ensure that a mine operator will maintain a minimum level of stream flow before the Bureau may approve a project. In *PUD No. 1*, the Supreme

Court held that the State of Washington could regulate stream flow and water quantity under its Clean Water Act authority. Great Basin points to the Supreme Court's holding that the Clean Water Act's definition of pollution "encompasses the effects of reduced water quantity." *Id.* at 719.

**[2]** However, *PUD No. 1* does not help Great Basin. *PUD No. 1* merely holds that states *may* set minimum flow standards as part of section 401 certification requirements; it does not hold that states *must* do so. In the absence of state law to the contrary, water withdrawals are not subject to the requirements of the Clean Water Act.

Other circuits have interpreted the Clean Water Act in the same way. In *North Carolina v. FERC*, 112 F.3d 1175 (D.C. Cir. 1997), the D.C. Circuit reached the same conclusion in holding that the withdrawal of water from a lake did not trigger the provisions of section 401. "[N]either the withdrawal of water from the Lake nor the reduction in the volume of water . . . 'results in a discharge' for purposes of Section 401(a)(1). . . . [T]he word 'discharge' contemplates the addition, not the withdrawal, of a substance or substances." *Id.* at 1187. Similarly, in *Save our Community v. EPA*, 971 F.2d 1155 (5th Cir. 1992), the Fifth Circuit held that the draining of wetland did not fall under Section 404 of the Clean Water Act: "We must conclude that without the existence of an effluent discharge of some kind, there is no coverage under section 404. There is no jurisdiction for the agencies or the courts to act." *Id.* at 1164. The District of Colorado, in a case with similar facts, reached the same conclusion: "under Colorado law, water quality standards apply only to discharges of pollution and not to withdrawals or appropriations of water. . . . The withdrawal of water is not a discharge of pollution under the CWA." *Colo. Wild, Inc. v. U.S. Forest Serv.*, 122 F. Supp. 2d 1190, 1193 (D. Colo. 2000).

The Supreme Court's recent decision in *S.D. Warren Co. v. Maine Board of Environmental Protection*, 126 S. Ct. 1843

(2006), is not to the contrary. There, the Court held that the release of water from a hydroelectric dam constituted a "discharge" into navigable waters that is subject to state water quality certification under Section 401 of the Clean Water Act. However, contrary to Great Basin's assertions, the Court did not address whether individual states are required to regulate withdrawal of water under the Act. Rather, *S.D. Warren Co.* reiterates that individual states have the responsibility of regulating water pollution and water use. *See id.* at 1853 ("Changes in the river like these fall within a State's legitimate legislative business, and the Clean Water Act provides for a system that respects the States' concerns").

[3] With this in mind, our next step is to determine whether Nevada law subjects withdrawal of water to the standards of the Clean Water Act, as it is permitted to do under *PUD No. 1*. Nevada statutory law creates different regimes for discharge of pollutants and dewatering. Discharge of pollutants is governed by the Nevada Water Pollution Control Law, Nev. Rev. Stat. § 445A.300-.730 (2006). The statute requires those seeking to discharge pollutants to obtain a permit from the Nevada state department of conservation and natural resources. Nev. Rev. Stat. § 445A.500 (2006). However, appropriation of water, including dewatering, is governed by a different statute, which maintains that any person wishing to appropriate or divert underground water should apply to the Nevada state engineer for a permit, and specifically refers to the use of water in "exploring for oil, gas, minerals or geothermal resources." Nev. Rev. Stat. § 534.050; 534.120. The Water Pollution Control Law also states that nothing in the law "shall be construed to amend, modify or supersede the provisions of [the water appropriation statutes] or any rule, regulation or order promulgated or issued thereunder by the state engineer." Nev. Rev. Stat. § 445A.725 (2006). Because the quality of discharged water and the quantity of appropriated water are governed by different laws and subject to different permits, it is clear that Nevada does not regulate dewatering under its Clean Water Act authority.

**[4]** Great Basin's claims under the Clean Water Act's anti-degradation provision and under the Management Act are equally untenable. The anti-degradation policy only refers to water quality standards and does not refer to water withdrawal. *See* 33 U.S.C. § 1313(d)(4). The Nevada anti-degradation provision, similarly, only refers to water quality. Nev. Rev. Stat. § 445A.565. As discussed above, the Nevada statutory regime clearly separates withdrawal of water from pollution of water, and the water pollution regime, including the anti-degradation statute, is defined so as not to supersede the water allocation regime. Thus, because Nevada does not regulate water withdrawal in the same regime as water quality, the Clean Water Act's anti-degradation provision is inapplicable.

The Management Act requires the government to "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). However, the Act also provides:

> Nothing in this Act shall be construed as limiting or restricting the power and authority of the United States or —
>
>> (1) as affecting in any way any law governing appropriation or use of, or Federal right to, water on public lands;
>>
>> (2) as expanding or diminishing Federal or State jurisdiction, responsibility, interests, or rights in water resources development or control.

43 U.S.C.A. § 1701, hist. note (g) (2006). We interpret this to mean that the Management Act does not expand the requirements of the Clean Water Act.

**[5]** Therefore, Great Basin's arguments regarding the potential "drying effect" are untenable as a matter of law.

B. *Discharged Groundwater*

Great Basin next argues that the groundwater discharged from Amended South Project into Maggie Creek will violate federal and state water quality requirements. The district court ruled that the plaintiffs had not properly raised these arguments before the Bureau.

1. Exhaustion

The APA requires that plaintiffs exhaust administrative remedies before bringing suit in federal court. 5 U.S.C. § 704. This requirement applies to claims under NEPA. "Persons challenging an agency's compliance with NEPA must structure their participation so that it . . . alerts the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful consideration." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004) (internal punctuation omitted), *quoting Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978).

We considered the degree to which parties must raise environmental claims before the agency in *Native Ecosystems Council*. There, we allowed the plaintiffs to raise arguments before us where they "presented a much less refined legal argument in their administrative appeal." 304 F.3d at 898. We defined the exhaustion requirement broadly: "The plaintiffs have exhausted their administrative appeals if the appeal, taken as a whole, provided sufficient notice to the [agency] to afford it the opportunity to rectify the violations that the plaintiffs alleged." *Id.* at 899. This, we held, comported with the purposes of the exhaustion requirement: "avoiding premature claims and ensuring that the agency be given a chance to bring its expertise to bear to resolve a claim." *Id.* at 900. "Requiring more might unduly burden those who pursue administrative appeals unrepresented by counsel, who may frame their claims in non-legal terms rather than precise legal formulations." *Id.* We have continued to use this analysis in sub-

sequent cases. *See, e.g., Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002).

**[6]** Applying this standard, we conclude that the Bureau was on notice that Great Basin took issue with the groundwater discharged into Maggie Creek. In its comment letter to the Bureau on the Amended South Project draft EIS, Great Basin wrote: "The [Amended South Project] indicates that groundwater released into Maggie Creek does not need to be treated, since the combined discharged water does not exceed the water quality standards established by the NPDES system. . . . This statement is different than saying that no impacts will occur. What are the water quality measurements in the Creek and in the discharged water? Are arsenic or TDS amounts increased over what exists naturally in Maggie Creek? Does the total amount of contaminants discharged add a significant amount to the total loads in the Humboldt River downstream?"

Under our case law, this was sufficient to preserve the claim for judicial review. Great Basin clearly expressed concern about the current and future levels of toxins in the discharged water, and the Bureau was on notice of these concerns.

**[7]** The district court's conclusion that this argument was unexhausted was in error. Accordingly, we proceed to the merits.

## 2. Merits

The Environmental Protection Agency and the states are responsible for administering the Clean Water Act. Possible water pollution clearly comes within the ambit of the Clean Water Act. *See* 33 U.S.C. § 1341.

**[8]** Newmont obtained a water pollution permit from the Nevada Division of Environmental Protection (NDEP), which

is responsible for regulating the discharge of pollutants into state waters. Great Basin's argument is based on a table attached to the Amended South Project EIS, which details the quality of the water discharged from Newmont between 1994 and 1998. According to Great Basin, the table shows that the groundwater pumped from Amended South Project has exceeded water quality standards and the limitations of Newmont's permit. The table belies Great Basin's argument. While it is true that the level of pollutants occasionally exceeded those allowed by Newmont's permit, the discharge was generally within the range allowed. The only measurement that was frequently out of line was for total dissolved solids. The thirty-day average for total dissolved solids was, however, well under the NDEP's permit's daily maximum.

Following the Clean Water Act's stricture that states should enforce water quality standards, the Bureau repeatedly told Newmont that it had to obtain a permit from NDEP before Newmont could discharge any pollutants. The Bureau reviewed the table and decided that "[t]he mine discharge has been generally within its permit limitations; no significant non-compliance has been found."

**[9]** Great Basin cites no law to demonstrate that the Bureau's analysis of the data was arbitrary or capricious, or, indeed, even incorrect. We therefore affirm the summary judgment on this claim.

## IV.

In 1926, President Calvin Coolidge created Public Water Reserve No. 107 (No. 107) by executive order. It provides:

> It is hereby ordered that every smallest legal subdivision of public land surveys which is vacant, unappropriated, unreserved public land and contains a spring or water hole, and all land within one quarter of a mile of every spring or water hole located on

> unsurveyed public land, be and the same is hereby
> withdrawn from settlement, location, sale or entry,
> and reserved for public use in accordance with the
> provisions of Section 10 of the Act of December 29,
> 1916.

*See United States v. Idaho*, 959 P.2d 449, 451 (Idaho 1998).
According to one court, "[t]he purpose of the reservation was
to prevent monopolization of water needed for domestic and
stock watering purposes." *United States v. City & County of
Denver*, 656 P.2d 1, 32 (Colo. 1983); *see also Idaho*, 959 P.2d
at 453 ("The purpose of PWR 107 was to prevent the monop-
olization by private individuals of springs and waterholes on
public lands needed for stockwatering").

Great Basin argued in the district court that the Bureau's
approval of the mining plans would reduce and eliminate
springs and waterholes in the region, thus causing the plans
to violate No. 107. The district court held that Great Basin
could not raise this claim because it was not raised before the
Bureau.

### A.   *Standing*

As a preliminary matter, Newmont argues that Great Basin
lacks constitutional and prudential standing to raise the No.
107 claim, because Great Basin's members have suffered no
injury-in fact and their interests do not fall within the "zone
of interest" that No. 107 was designed to protect.

"[E]nvironmental plaintiffs adequately allege injury in fact
when they aver that they use the affected area and are persons
for whom the aesthetic and recreational values of the area will
be lessened by the challenged activity." *Friends of the Earth,
Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 183 (2000) (inter-
nal quotations omitted). Great Basin has submitted declara-
tions from its members that detail the injury that the
dewatering of the springs will cause to their recreational lives.

For example, Daniel Randolph, a member of Great Basin, stated that he has "spent a great deal of time in northern Nevada, hiking, camping, swimming, and taking pictures. A portion of that time has been spent in the area that will be affected by the [Amended South Project] and Leeville." He went on to detail several occasions when he participated in recreational activities on the land in question. Furthermore, the injury complained of would not occur if the mining projects were not approved, and an injunction would provide complete relief. The members of Great Basin have alleged injury-in-fact, causation, and redressability. Great Basin has Article III standing.

With regards to prudential standing, the "zone of interest" test is not particularly stringent. The Supreme Court has held that "[t]he proper inquiry is simply whether the interest sought to be protected by the complainant is *arguably* within the zone of interests to be protected . . . by the statute." *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 492 (1998) (internal quotations omitted) (emphasis in original). The plaintiffs' declarations specifically state that "[m]embers of GBMW . . . utilize springs and waterholes on federal public land in Nevada for stockwatering and other water-related purposes." This is sufficient to fall within the zone of interest.

**[10]** We conclude that Great Basin has standing to raise the No. 107 claim.

### B.   *Exhaustion*

Great Basin admits that it did not mention No. 107 by name in the proceedings before the Bureau, but argues that the Bureau was on notice that the public was concerned about the loss of these public water reserves. The district court held that Great Basin had failed to raise the claim before the Bureau, citing *Vermont Yankee Power Corp.*: "[A]dministrative proceedings should not be a game or a forum to engage in unjus-

tified obstructionism by making cryptic and obscure reference to matters that 'ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider matters 'forcefully presented.' " 435 U.S. at 553-54.

[11] We have held that "claimants who bring administrative appeals may try to resolve their difficulties by alerting the decision maker to the problem in general terms, rather than using precise legal formulations." *Rittenhouse*, 305 F.3d at 965. However, in this case we conclude that the connection between No. 107 and the concerns raised is too attenuated. Great Basin made general comments about groundwater, springs, and seeps. These comments in no way suggest an argument that the Bureau failed to protect federally-reserved water rights under an eighty-year-old Executive Order.

[12] The district court correctly held that Great Basin's claims under No. 107 were not exhausted.

## V.

Great Basin next argues that the Bureau violated NEPA by not evaluating Leeville and the Amended South Project in a single environmental impact statement. Great Basin argues that the Amended South Project and Leeville are connected actions and thus must have been evaluated together. The district court held that the argument was unexhausted because Great Basin failed to raise it before the Bureau. In the alternative, the district court held that the plaintiffs had failed to establish that the actions were connected.

### A.  *Exhaustion*

In their comments on the final EIS, the plaintiffs stated, with regard to tailings generated by Leeville and the Amended South Project, that "it is essential to consider the

South Operations Area and the Leeville as linked projects." The district court found this insufficient because the "comment mentions the tailings, but nothing else. It does not mention the ore, sludge, or waste water, and it does not mention any of the adjacent mines."

"Claims must be raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised, but there is no bright-line standard as to when this requirement has been met and we must consider exhaustion arguments on a case-by-case basis." *Rittenhouse*, 305 F.3d at 965. Our review of the record indicates that Great Basin adequately raised the issue of connected actions. "The plaintiffs have exhausted their administrative appeals if the appeal, taken as a whole, provided sufficient notice . . . to afford [the agency] the opportunity to rectify the violations that the plaintiffs alleged." *Native Ecosystems Council*, 304 F.3d at 899. While the plaintiffs here did not cite to the requisite federal regulation, they "clearly expressed concern" that the projects were linked. *Rittenhouse*, 305 F.3d at 966.

**[13]** Additionally, the record indicates that the Bureau was on notice that the actions might appear to be connected. In its response to the plaintiffs' request for judicial notice, the Bureau stated that "it did consider the environmental issue implicated by this document in detail: whether the challenged mining proposals were sufficiently dependent or independent to either have or lack an independent purpose." "Because plaintiffs raised the issue . . . sufficiently for the agency to review these procedures . . . , we hold that the plaintiffs exhausted their administrative remedies . . . ." *Native Ecosystems Council*, 304 F.3d at 899-900; *see also Northwest Resource Info. Ctr.,* 56 F.3d at 1067 ("[T]he Corps was well-aware of the criticisms of the scope of the SEIS before, during, and after the . . . process").

B. *Merits*

NEPA "requires a federal agency to prepare an EIS for all 'major Federal actions significantly affecting the quality of

the human environment.' " *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1115 (9th Cir. 2000), *quoting* 42 U.S.C. § 4332(2)(C). The Council on Environmental Quality's implementing regulation of NEPA requires, regarding the scope of an EIS:

> The scope of an individual statement may depend on its relationships to other statements. To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts. They include:
>
>   (a)   Actions (other than unconnected single actions) which may be:
>
>      (1)   Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:
>
>         (i)   Automatically trigger other actions which may require environmental impact statements.
>
>         (ii)   Cannot or will not proceed unless other actions are taken previously or simultaneously.
>
>         (iii)   Are interdependent parts of a larger action and depend on the larger action for their justification.
>
>      (2)   Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be

discussed in the same impact statement.

(3) Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.

40 C.F.R. § 1508.25 (citations omitted).

The purpose of this requirement is "to prevent an agency from dividing a project into multiple 'actions,' each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Wetlands Action Network*, 222 F.3d at 1118 (internal quotations and citation omitted). Where, as here, the agency declines to produce a single EIS, "plaintiffs must show that the [agency] was arbitrary and capricious in failing to prepare one comprehensive environmental statement." *Native Ecosystems Council*, 304 F.3d at 894, *citing Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).

**[14]** We apply an "independent utility" test to determine whether multiple actions are so connected as to mandate consideration in a single EIS. The crux of the test is whether "each of two projects would have taken place with or without the other and thus had 'independent utility.' " *Wetlands*

*Action Network*, 222 F.3d at 1118 (internal quotations and citation omitted). When one of the projects might reasonably have been completed without the existence of the other, the two projects have independent utility and are not "connected" for NEPA's purposes. *Native Ecosystems Council*, 304 F.3d at 894.

In *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1215 (9th Cir. 1998), we held that five potential logging projects in the same watershed were cumulative and had to be evaluated in a single EIS, where they were reasonably foreseeable and "developed as part of a comprehensive forest recovery strategy." Similarly, in *Thomas v. Peterson*, 753 F.2d 754, 758 (9th Cir. 1985), we held that a logging project and a road to facilitate the logging had to be considered in a single EIS because "the timber sales [could not] proceed without the road, and the road would not be built but for the contemplated timber sales."

We have held that less-interconnected projects need not be evaluated in the same EIS. In *Wetlands*, we held that a joint EIS was not required where details and planning for subsequent phases of development had not been completed or authorized. "Finding that the Corps was required . . . to have analyzed the environmental impacts of the three phases in a single EA or EIS would require the government to do the impractical." 222 F.3d at 1119. In *Sylvester v. U.S. Army Corps of Eng'rs*, 884 F.2d 394, 400 (9th Cir. 1989), we declined to require a single EIS covering both a resort complex and a golf course, where only the golf course (built on wetlands) implicated federal law. "[E]ach could exist without the other, although each would benefit from the other's presence." *Id.*

Great Basin points to several statements in the EISs to argue that Leeville and the Amended South Project are connected actions. "The Leeville Project ore deposits consist of refractory material that would be hauled directly to processing

facilities located at the Refractory Ore Treatment Plant at Newmont's South Operations Area." In addition, "[t]ailing material that would result from processing of the Leeville Project ore would be managed at Newmont's tailing disposal facility in the South Operations Area." The Leeville draft EIS also contained a diagram showing that all ore from Leeville would be processed at the South Operations Area. Great Basin does not argue that the Amended South Project is dependent on Leeville.

**[15]** While it is true that the ore from Leeville will be processed at the South Operations Area, there is no indication that the ore will be processed at the Amended South Project, the new facilities at issue in this litigation. In fact, the Leeville draft EIS specifically states that "[t]ailing from processing Leeville ore at South Operations Area would be deposited in existing tailing disposal facilities. Modification or expansion of the tailing disposal facility beyond the current authorized capacity would not be required to process ore from the Leeville Project." Ore from Leeville is to be processed at Mill 6, which was permitted by the Bureau to existing capacity in 1993. Leeville and the Amended South Project seem to have very little connectedness.

**[16]** "Mindful of the deference that agencies are to be accorded in scientific matters, in these circumstances we decline at this time to require the BLM to produce a single document." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 1000 (9th Cir. 2004). In this situation, we go even further: there is no factual support for Great Basin's argument that Leeville and the Amended South Project are interdependent such that they must be evaluated in a joint environmental impact statement. It follows that the Bureau's failure to do so was not arbitrary or capricious.[1]

---

[1]In arguing that the Bureau should have evaluated Leeville and Amended South Project in a single EIS, the separate concurrence and dissent concludes that "[i]t would be not merely unwise, but also entirely

## VI.

Great Basin argues that the Bureau's cumulative impact analysis was inadequate under NEPA. The district court held that Great Basin had failed to raise these claims adequately before the Bureau. In the alternative, the district court held that the Bureau had "comprehensively considered the project's potential cumulative impacts" and rejected Great Basin's argument. "Whether a particular deficiency, or combination of deficiencies, in an EIS is sufficient to warrant holding it legally inadequate, or constitutes merely a 'fly-speck,' is essentially a legal question, reviewable de novo." *Churchill County v. Norton*, 276 F.3d 1060, 1071 (9th Cir. 2001) (quotation omitted).

### A. *Exhaustion*

According to the district court, "the record reflects that Plaintiffs failed to raise these issues before the administrative

---

irrational to proceed with the mining of Leeville in the absence of available processing facilities." This fails to acknowledge that Leeville's ore is to be processed in *existing* facilities whose operations have not been challenged in this action. According to the record, Leeville could be mined regardless of whether the South Operations Area Project is ever expanded.

Here, the Leeville Draft EIS states that the ore brought to the surface "would be hauled directly to processing facilities at the Refractory Ore Treatment Plant (Mill #6) located at Newmont's South Operations Area." There is no allegation that Mill #6 is to be expanded in any way by Amended South Project. Similarly, it is clear that tailings from Leeville are to be deposited at the existing facility. Put simply, Great Basin points to no evidence that the Leeville mine will use the expanded portion of the South Operations Area in *any* way.

Accordingly, the Amended South Project and Leeville fail the "independent utility" test. *See Wetlands Action Network*, 222 F.3d at 1118. There was no need to evaluate the projects in a single EIS. "[E]ach could exist without the other, although each would benefit from the other's presence." *Sylvester*, 884 F.2d at 400. The conclusion of the separate opinion to the contrary is supported by neither our caselaw nor the record.

agencies." However, in comments submitted on the Amended South Project draft EIS, the Mineral Policy Center argued that the cumulative impacts analysis was inadequate: "There are numerous large operating gold mines in the region that must also be fully considered in a regional comprehensive impact analysis." The Bureau responded that it had indeed identified all the known or reasonably foreseeable projects. Additionally, many other comments raised cumulative impacts issues. For example, the EPA commented on the inadequacy of the air pollution analysis within the cumulative impacts analysis. Other public comments expressed concern with the cumulative impacts analysis.

We have held that there is no "broad rule which would require participation in agency proceedings as a condition precedent to seeking judicial review of an agency decision." *Northwest Envtl Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1534-35 (9th Cir. 1997), *quoting Kunaknana v. Clark*, 742 F.2d 1145, 1148 (9th Cir. 1984). We hold that, in this case, the comments were sufficient "to allow the agency to give the issue meaningful consideration." *Public Citizen*, 541 U.S. at 764 (internal punctuation and citation omitted). We thus reach the merits of Great Basin's claim.

B.  *Merits*

A cumulative impact is defined in NEPA's implementing regulations as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . . Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7. We have held that "[a] proper consideration of the cumulative impacts of a project requires some quantified or detailed information; *general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided.*" *Klamath-Siskiyou Wild-*

*lands Ctr.*, 387 F.3d at 993 (emphasis added) (internal quotations and citations omitted). "The analysis must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects." *Id.* at 994 (internal quotations and citations omitted). "Defendants must do more than just catalogue 'relevant past projects in the area.' " *Churchill County*, 276 F.3d at 1080, *quoting City of Carmel-by-the-Sea*, 123 F.3d at 1160. "[I]n assessing cumulative effects, the Environmental Impact Statement must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and difference between the projects, are thought to have impacted the environment." *Lands Council*, 395 F.3d at 1028.

Great Basin argues that the final EISs do not adequately review the environmental impacts from the other past, present, and reasonably foreseeable projects in the area because they merely list other mines in the area without detailing impacts from each one. In addition to this general concern, Great Basin argues that the cumulative impacts analysis is infirm in three specific ways: first, that the final EISs fail to address the impacts from Newmont's Pete Project and North Operations, and from Barrick Corporation's Betze/Post mine; second, that the Leeville final EIS fails to analyze the cumulative impacts from disposal of sludge both at Leeville and at the other area mines; and third, that the Leeville final EIS fails to review environmental impacts from disposal of Leeville wastewater at the Betze/Post mine.

In *Lands Council*, the plaintiffs argued that the cumulative impacts analysis contained in an EIS for a large timber sale was inadequate, because the Forest Service "did not note in detail past timber harvesting projects and the impact of those projects on the . . . watershed." *Id.* at 1027. We agreed with the plaintiffs:

> [T]here is no catalog of past projects and no discussion of how those projects (and differences between

the projects) have harmed the environment. Apart from a map in the Project file that shows past harvests, with general notes about total acres cut per watershed, there is no listing of individual past timber harvests. Moreover, there is no discussion of the connection between individual harvests and the prior environmental harms from those harvests that the Forest Service now acknowledges. Instead, the Final Environmental Impact Statement contains only vague discussion of the general impact of prior timber harvesting, and no discussion of the environmental impact from past projects on an individual basis, which might have informed analysis about alternatives presented for the current project.

*Id.*

Similarly, in *Klamath-Siskiyou*, we reviewed environmental assessments (EAs) prepared by the Bureau involving multiple timber sales within the same watershed. Although each of the EAs included a twelve-page section headed "Cumulative Impacts," we concluded that the sections were inadequate: "A considerable portion of each section discusses only the direct effect of the project at issue on its own minor watershed. In the parts of the section where the other projects are contemplated, there is no quantified assessment of their combined environmental impacts." 387 F.3d at 994. The analysis, we pointed out, principally consisted of a table that included projected impacts from the other sales. We held that the table was insufficient because it did not provide "objective quantification of the impacts. . . . [T]he reader is informed only that a particular environmental factor will be 'unchanged,' 'improved,' or 'degraded' and whether that change will be 'minor' or 'major.' The reader is not told what data the conclusion was based on, or why objective data cannot be provided." *Id.*

Under the standard set forth by *Lands Council* and *Klamath-Siskiyou*, we conclude that the cumulative impacts

analyses in the Amended South Project and Leeville final EISs are insufficient. The Amended South Project cumulative impacts review is largely based on the April 2000 analysis of the impacts of the groundwater pumping to be done by Leeville, Amended South Project, and the nearby Goldstrike mine. While this April 2000 document and the Amended South Project final EIS contain an in-depth discussion of impacts from groundwater pumping, other mines are mentioned in almost no other part of the cumulative impacts analysis.

**[17]** In the Amended South Project final EIS, the analysis of the effects of existing mines in the area is limited to a generic map entitled "Mining Activity in the Carlin Trend" and three tables that list existing and reasonably foreseeable mines. The "Air Resources" section of the final EIS, for example, contains the conclusory statement that "[t]here is potential for cumulative effects from hazardous air pollutants including compounds of arsenic, hydrogen cyanide, manganese, propylene, and acid aerosols. . . . Cumulatively, these mining emissions are minimized to some degree because of project separation distances, meteorological conditions that promote good dispersion, and the fact that not all projects would produce emissions concurrently." Nowhere is this somewhat alarming statement supported by data broken down by mine, or even by cumulative data.

**[18]** Similarly, when discussing hazardous waste, the final EIS simply states that "[a]ll hazardous wastes must be handled according to approved permits or be disposed of according to state or federal regulations. The known and reasonably foreseeable project would cumulatively result in larger volumes of hazardous wastes stored on site, transported on state and federal highways, and disposed of in approved disposal sites." The report states that the volumes of hazardous waste cannot be quantified "until future hazardous waste generators are identified." However, the report could at the least quantify the existing volumes of hazardous waste, and fails to do so.

We hold that these vague and conclusory statements, without any supporting data, do not constitute a "hard look" at the environmental consequences of the action as required by NEPA. As in *Lands Council*, the final EIS contains "no discussion of the environmental impact from past projects on an individual basis" apart from the pumping of groundwater. 395 F.3d at 1027.

The Bureau responds that the acreage of surface disturbance with the Pete Project, at least, is implicitly included in the cumulative effects analysis for other resources, such as soils and vegetation. We have held, however, that this is insufficient under NEPA. "A calculation of the total number of acres to be [impacted by other projects] in the watershed is a necessary component of a cumulative effects analysis, but it is not a sufficient description of the actual environmental effects that can be expected from logging those acres." *Klamath-Siskiyou*, 387 F.3d at 995. The Bureau also gives no explanation for why other mining projects were not explicitly discussed in the cumulative impacts analysis.

[19] The Leeville final EIS is also insufficient, similarly failing to discuss the specific impacts of other mines except in the analysis of groundwater pumping. For example, the analysis of cumulative impacts on air is only five sentences long and includes no mine-specific or cumulative data, merely stating that "[a]mbient air quality data for the region currently reflects impacts of existing mining operations in the airshed."

Additionally, as Great Basin points out, the Leeville final EIS contains no discussion whatsoever of the cumulative impacts of sludge or hazardous waste disposal. The Bureau responds by saying that the toxicity of the sludge has not been determined and thus need not be analyzed. If allowed, this would vitiate the Bureau's duty to take a "hard look" at the cumulative impacts of the action.

[20] "The [Bureau] cannot simply offer conclusions. Rather, it must identify and discuss the impacts that will be

caused by each successive [project], including how the combination of those various impacts is expected to affect the environment, so as to provide a reasonably thorough assessment of the projects' cumulative impacts." *Id.* at 1001. We conclude that the cumulative impacts analysis done by the Bureau was insufficient and thus reverse the district court on this ground.

Because we hold that the cumulative impacts analysis was insufficient, we need not address whether the Newmont power plant should have been considered by the Bureau in the first instance. We observe, however, that Newmont proposed the power plant before the Decisions were issued, and that we have upheld the Environmental Protection Agency's rule change to accommodate the proposal. *See Great Basin Mine Watch v. EPA*, 401 F.3d 1094, 1100-01 (9th Cir. 2005). Thus, the Bureau may consider in the first instance whether the power plant and its emissions are, at this point, "reasonably foreseeable" for purposes of inclusion in the cumulative impacts analysis.

## VII.

43 C.F.R. § 3809.552(a) maintains that individual financial assurances (FAs) "must cover the estimated cost as if [the Bureau] were to contract with a third party to reclaim your operations according to the reclamation plan, including construction and maintenance costs for any treatment facilities necessary to meet Federal and State environmental standards." The Bureau allowed Newmont to bond the Amended South Project in phases. Great Basin argues that the financial assurances were invalid both procedurally and substantively. The district court held that Great Basin "failed to establish that the [Bureau] abused its discretion or was arbitrary and capricious in its bonding decisions."

"We must give substantial deference to an agency's interpretation of its own regulations. Our task is not to decide

which among several competing interpretations best serves the regulatory purpose." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (citations omitted). "[J]udicial review of an agency's interpretation of its own regulations is limited to ensuring that the agency's interpretation is not plainly erroneous or inconsistent with the regulation." *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1097 (9th Cir. 2003).

Great Basin first argues that the Bureau failed to calculate the full cost of reclamation before approving a bond for Phase I of the Amended South Project, and that such a calculation is required by 43 C.F.R. § 3809.552. We agree with the Bureau that the regulation does not require the calculation. The cited regulation merely requires the Bureau to obtain a financial guarantee before permitting.

**[21]** Great Basin's interpretation of the regulation is also in conflict with other regulations allowing the bond amount to be posted in phases. *See* 43 C.F.R. § 3809.553(a) ("BLM may authorize you to provide a financial guarantee covering a part of your operations"); 43 C.F.R. § 3809.553(b) ("BLM will review the amount and terms of the financial guarantee for each increment of your operations at least annually"). The Bureau did not act arbitrarily or capriciously in failing to calculate the bond amount for the entire project.

Next, Great Basin contends that the amount of the bond was "grossly inadequate." According to Great Basin, the Amended South Project Phase I FA failed to follow the Bureau's binding regulations because it did not add enough for indirect costs. Great Basin relies primarily on two reports prepared by its expert, James R. Kuipers. However, as the Bureau points out, the fact that Great Basin's consultant disagrees with the Bureau's analysis does not make the analysis arbitrary and capricious. *See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1993) ("an agency must have discretion to rely on the reasonable opinions of its own quali-

fied experts even if, as an original matter, a court might find contrary views more persuasive"). Additionally, though Great Basin argues that the Bureau has assumed that "costs will *never* rise in upcoming years," the Bureau's regulations mandate review of the "amount and terms" of phased FAs "at least annually," 43 C.F.R. § 3809.553(b), and in the case of non-phased FAs, "periodically." *Id.* § 3809.552(b).

Finally, Great Basin argues that the Bureau erroneously allowed Newmont to post a corporate guarantee instead of providing a proper financial instrument. While the Bureau "will not accept any new corporate guarantees or increases to existing corporate guarantees," 43 C.F.R. § 3809.574, the prohibition does not apply to corporate guarantees that were in effect prior to January 20, 2001.

It is clear that, in this case, the bond refers to corporate guarantees that existed prior to the regulation: "August 1995 bonding documentation provided to [the Bureau] from Newmont shows that the Nevada Division of Environmental Protection holds $2,250,000 in the form of Corporate Guarantees . . . ." Great Basin's argument fails as a matter of law.

**[22]** We conclude that the Bureau did not act arbitrarily or capriciously in setting Newmont's financial assurance requirements.

## VIII.

Finally, Great Basin seeks to file a notice from the NDEP concerning Newmont's state water permit application. According to Great Basin, the document demonstrates that both Newmont and NDEP consider Leeville, the Amended South Project, and another Newmont project, Pete, to be one project for permitting purposes. The Notice was issued after the stipulated deadline for filing extra-record documents. The district court refused to admit the notice into evidence and also refused to take judicial notice of the facts contained in it.

We review for an abuse of discretion. *Northcoast Envtl Ctr. v. Glickman*, 136 F.3d 660, 665 (9th Cir. 1998).

The Supreme Court has expressed the general rule that courts reviewing the agency action are limited to the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985). However, "[i]n limited circumstances, district courts are permitted to admit extra-record evidence: (1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith." *Lands Council*, 395 F.3d at 1030, *quoting Southwest Ctr.*, 100 F.3d at 1450 (internal quotations and citation omitted). The district court held that the plaintiffs "failed to satisfy any of these exceptions."

**[23]** We hold that the district court did not abuse its discretion in refusing to admit the extra-record evidence. As the district court stated, the plaintiffs "have not demonstrated that the criteria used by NDEP have any relevance to a NEPA analysis. . . . [T]he NDEP Notice does not assist in understanding either the subject matter of this case or BLM's decision." The document was not relied on by the Bureau, is not necessary to explain technical terms, and does not demonstrate bad faith on the part of the Bureau.

**[24]** For the same reasons, the district court did not abuse its discretion in refusing to take judicial notice of the facts set forth in the document.

**AFFIRMED IN PART; REVERSED IN PART; REMANDED.**

THOMAS, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority's holding that the Bureau's cumulative effects analysis was insufficient under NEPA, and its consequent reversal of the district court's grant of summary judgment as to that issue. However, I respectfully dissent from the conclusion that Leeville and the Amended South Project are not connected actions requiring a single, comprehensive EIS.

A careful analysis of the record demonstrates that the Bureau should have prepared a single comprehensive EIS for Leeville and the Amended South Project. Leeville is dependent on the South Operations Area Project. Because the Amended South Project is merely, in the agency's words, "an expansion of" the South Operations Area Project, Leeville and the Amended South Project are necessarily connected actions for NEPA purposes.

Employment of the "independent utility" test does not lead to a different conclusion. The benchmark of "independent utility" is whether " 'each of two projects would have taken place with or without the other and thus had independent utility.' " *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1118 (9th Cir. 2000). When one of the projects might reasonably have been completed without the other, each has independent utility and they are not 'connected' for NEPA purposes. *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 894 (9th Cir. 2002). The sole purpose behind the Leeville mine is to obtain gold and other minerals from the solids mined. For this to be accomplished, those solids must be processed after extraction. The solids extracted at Leeville are sent to the South Operations Area Project for processing. The Leeville draft EIS states that "[o]re hoisted to the surface would be hauled directly to processing facilities at the Refractory Ore Treatment Plant (Mill #6) located at Newmont's South Operations Area [Project], or placed in a refractory ore

stockpile approximately one-half mile west of the production shaft."[1] The total amount of "ore [and waste rock] hoisted to the surface" is around 18 million tons. The two projects are clearly interconnected and should be considered in a single EIS.

Our case law supports this conclusion. In *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1215 (9th Cir. 1998) and *Thomas v. Peterson*, 753 F.2d 754, 758 (9th Cir. 1985), we determined (1) that five logging projects in one watershed, and (2) a logging project and a road to facilitate it, respectively, had to be considered in comprehensive EISs. Proper application of *Blue Mountains* and *Thomas* dictate that a single EIS should have been prepared in this case.

The Bureau relies on *Wetlands Action Network*, 222 F.3d at 1119, and *Sylvester v. U.S. Army Corps of Engineers*, 884 F.2d 394, 400 (9th Cir. 1989), in which we held that comprehensive EISs were not required for (1) three phases of a wetlands filling project, and (2) a resort complex and golf course. However, those cases are distinguishable from the present circumstance.

In *Sylvester*, we noted that the resort and golf course "each could exist without the other, although each would benefit from the other's presence." *Sylvester*, 884 F.2d at 400. Similarly, we reasoned in *Wetlands Action Network* that "the utility of [the first] part of the project does not depend upon the completion of the later phases of the project[, and i]t would not be unwise or irrational to undertake the building of Phase I even if it was determined that the later phases could not be constructed." 222 F.3d at 1118.

---

[1]Presumably, the ore placed in the stockpile is stored there until it also goes to the South Operations Area Project for processing. Even if it does not, however, the analysis is unaltered, applying with the same force to a portion of the mined solids as to the whole.

Leeville and the Amended South Project are more akin to the logging project and logging road than the resort complex and golf course. It would be not merely unwise, but also entirely irrational to proceed with the mining of Leeville in the absence of available processing facilities.[2] *See id.; see also Trout Unlimited v. Morton*, 509 F.2d 1276, 1285 (9th Cir. 1974) (requiring a single EIS where "[t]he dependency is such that it would be irrational, or at least unwise, to undertake the first phase if subsequent phases were not also undertaken"). The South Operations Area Project processing facilities are therefore more like the logging road in *Thomas*, which was essential to the logging operation at issue, than the golf course in *Sylvester*, which was beneficial but not essential. Rather than merely "benefit[ting] from the . . . presence" of the South Operations Area Project, the Leeville project could not exist without a processing facility. This facility is in the South Operations Area Project, and so the agency should have prepared a single EIS to analyze the impact of both Leeville and the expansion of the South Operations Area Project, the Amended South Project.

To the Bureau, Leeville's dependence on the South Operations Area Project is unproblematic; it accepts the contention that the South Operations Area Project and the Amended South Project are distinct and unconnected. However, the record is replete with the Bureau's assertions that the Amended South Project is, for all relevant purposes, nothing more than an expansion of the South Operations Area Project. For example, the final EIS for the Amended South Project

---

[2]The Bureau also relies on the fact that tailing from processing Leeville ore at the South Operations Area Project would be deposited in existing tailing disposal facilities. The tailings are the waste products that remain after the valuable components are isolated and extracted through processing. Because processing is itself an essential step, and processing at the South Operations Area Project is sufficient to defeat Leeville's "independent utility," it is irrelevant that disposal of post-processing tailing does not show Leeville's further dependency on the South Operations Area Project.

describes the project as "activities that would support continued operation and expansion of existing gold mining and processing at [Newmont's] South Operations Area Project[, which] would not cause any new kinds of [environmental] impacts . . . but would extend the time period during which existing impacts would continue." The Amended South Project represents the expansion from the 7,960 total acres disturbed by the South Operations Area Project to 9,352 total acres, disturbed by the South Operations Area Project and the Amended South Project together. Indeed, in preparing the final EIS for the Amended South Project, the Bureau noted that "[i]n many cases, the EIS will refer to the original South Operations Area Project EIS rather than repeat information that has not changed substantially [since the preparation of that document]." Similarly, in response to a comment by Mineral Policy Center that "[d]ue to the complexity, size, and importance of the current [draft EIS] (and [cumulative impacts analysis]), the sixty day comment period [wa]s not nearly sufficient for full and competent response," the agency simply noted that it "consider[ed] 60 days to be adequate because this Plan of Operations is an expansion of an existing project."

It is illogical for the agency to assert the Amended South Project's intense connection to the South Operations Area Project when convenient, only to deny that same connection in order to justify the refusal to prepare a single EIS for the Leeville and Amended South Projects. Permitting the Bureau to do so would impermissibly allow the agency to "divid[e] a project into multiple 'actions,' each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Wetlands Action Network*, 222 F.3d at 1118 (internal quotation marks and citation omitted). Here, the asserted division between the Amended South Project and the South Operations Area Project acts to insulate Leeville from the Amended South Project, in contravention of both CEQ guidelines and our caselaw.

For these reasons, I conclude that a single, comprehensive EIS was required and would reverse the district court's grant of summary judgment for the defendants as to this issue, as well as the cumulative impacts analysis. I therefore respectfully dissent.